**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BOBBY MYERS,
Plaintiff-Appellant,

v.

No. 97-2457

AVERY DENNISON CORPORATION, a
Delaware Corporation authorized to
do business in Virginia,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CA-97-33-2)

Argued: May 5, 1998

Decided: September 3, 1998

Before HAMILTON and MOTZ, Circuit Judges, and
BEEZER, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

_____

Affirmed in part and reversed and remanded in part by unpublished
per curiam opinion. Senior Judge Beezer wrote a separate opinion
concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Thomas Scott Carnes, SYKES, CARNES, BOURDON &
AHERN, P.C., Virginia Beach, Virginia, for Appellant. Stephen

Wainger, HUFF, POOLE & MAHONEY, P.C., Virginia Beach, Virginia, for Appellee. **ON BRIEF:** Timothy M. Richardson, HUFF, POOLE & MAHONEY, P.C., Virginia Beach, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This appeal arises out of a breach of contract action brought by Bobby Myers against his former employer, Avery Dennison Corporation.

I.

Between 1974 and 1995, Avery employed Myers as a machinery salesman in the company's Labeling Machinery Division (LMD). At the time of the events giving rise to this suit, Myers, as an LMD sales manager, was responsible for overseeing machinery sales originating in North America and Mexico. Myers received a base salary plus a "tiered" percentage commission on machinery sales, with the percentage fluctuating as the amount of sales increased. Periodically Avery would unilaterally restructure the commission tiers; this happened many times after Myers joined Avery. For projects of unusual volume, resulting in atypically large commissions, Avery was known to reduce the commission percentage paid to sales staff. On occasion, Myers had also received a percentage commission on sales of labels made in conjunction with machine sales.

In April 1992, Avery, through its Security Printing Division, began negotiating with Duracell, Inc. to supply pressure-sensitive labels for its batteries. Avery referred to this project as "T2." Myers was asked to assist in this sales effort to develop a prototype machine that would manufacture these labels. In late 1992, T2 began to falter, yet by

2

1993, Avery had reorganized and expanded the project, referring to this new phase as "Darwin." Myers played a lesser role in Darwin than he did in T2.

In November 1993, Avery executives declared Duracell a special project meriting an alternative tiered commission for machine sales. At the time the Duracell deal took shape, Myers was compensated generally at 1.7% for annual machine sales up to $625,000, 3.4% on sales from $625,000 to $1,000,000 and 5.1% after his sales rose above the $1 million mark. For Darwin, Avery altered this scheme, providing 4% commission on the first million dollars of Duracell machine sales, 3% on the second million and 2% any sales above two million. At Avery's request, Myers memorialized his agreement to this special commission structure in a letter dated January 25, 1994. Of a total of 36 machines sold to Duracell during Darwin, Myers received commission on the 22 machines sold in North America and Mexico at this 4-3-2% rate. Myers did not receive any commission on machines sold in any other area or on any labels sold in connection with Darwin.

Myers filed this suit against Avery, alleging that he was entitled to a commission not at the 4-3-2% rate, but at the rate generally applicable to Avery machine sales, for all machines sold to Duracell (not just those sold in the United States and Mexico). He also alleged that he was entitled to a commission on all label sales made in connection with the Duracell deal. The district court granted summary judgment to Avery, holding that Myers, pursuant to his January 25 letter, was properly compensated at the 4-3-2% commission rate, and that this letter entitled Myers only to compensation on machines sold in the United States. The court also concluded that Myers was not entitled to a commission on label sales arising from the Duracell deal.

II.

Having reviewed the record, briefs, and relevant case law, and having the benefit of oral argument, we conclude that the district court's ruling as to the commission percentage to which Myers was entitled on machines sold during the Darwin project was correct. Myers agreed in writing to the special 4-3-2% compensation structure and is

3

bound by that agreement. Accordingly, we affirm the judgment as to this claim, on the reasoning of district court.

III.

However, disputed issues of material fact preclude the grant of summary judgment to Avery at this time on the two remaining claims. The first of these is Myers' contention that, regardless of which tiered structure applies, he is entitled to a commission on machines sold outside of his geographic region. Avery maintains that because sales staff received machinery commission incentives based on the geographical location of the sale and these machines were sold outside of Myers' region, Myers was not entitled to commissions on these sales. The district court apparently found the company's argument persuasive. Although the court did not directly address this issue, it found that in paying Myers a commission on six (of the 22) machines sold in Mexico, Avery paid him "more than that to which he was entitled." The district court seemed to believe that the undisputed evidence revealed that Myers' January 25 memorandum covered only the 16 machines, which as of that date, the parties anticipated would be sold in the United States.

We can find nothing in the record that mandates this conclusion. Nowhere in the January 25 letter is Myers' commission limited to machines sold in a certain region. Rather, the letter states that:

> [o]n the first one million dollars of business [Myers'] incentive will be 4%. On the next one million dollars of business the incentive will be 3%. On all subsequent million dollar incremental business the payout will be 2%.

(Emphasis added). Thus, the letter is ambiguous as to what exactly constitutes "business" generated by the Duracell deal.

Furthermore, sufficient credible evidence exists to raise a genuine issue of fact as to whether "business" was limited to machines sold in the United States. Tom Hampton, LMD's general manager, testified in his deposition that at the time the letter was drafted, "no one knew exactly how many machines" would be sold and, thus, how

4

many machines for which Myers would receive a commission. Myers also stated in an affidavit that on at least four separate occasions prior to the Duracell deal, he had received commissions on machines sold outside his geographic area, indicating that Avery's practice was to compensate salespersons for machines sold outside the area for which they were responsible.

As to Myers' remaining contention -- that he is entitled to a commission on labels sales -- both parties agree that Myers' compensation for labels sales is governed by a written memorandum, dated May 17, 1994, entitled "SSE Label Compensation Program." See Appellant's Brief at 14, Appellee's Brief at 26. The memorandum states that it "formalize[s] the definition and procedure for the 1% commission that will be paid to you [LMD machine salespersons] for label sales," which includes "new label business sold in conjunction with a pressure sensitive labeling machine." (J.A. 60 OO) (Emphasis added). The memorandum further states, in pertinent part, that to receive compensation:

> [The machinery salesperson] must be actively involved with the Label salesperson in selling the total system to an account [and] . . . .

> The attached "System Sales Qualification" form must be completed and returned to the appropriate Division.

Avery asserts that it is entitled to summary judgment because this compensation plan does not apply to any label sales made as a result of joint sales efforts between LMD machinery salespeople and a label salesperson in the Security Printing Division, the division credited with selling Duracell labels. More specifically, Avery asserts that the uncontroverted deposition testimony of the memorandum's drafter, Ralph Torres, demonstrates that this compensation plan applied only to joint sales made between LMD salespeople and labels salespeople in the following Avery divisions: Decorative Technologies, Durables and Automotives, and Pharmaceuticals. Torres explained that this is so because the memorandum was addressed to the heads of each of these named divisions and not to the head of the Security Printing Division.

5

Yet the May 17 memorandum itself does not provide that it covers only sales of labels made as part of a joint effort between LMD machinery salespeople and labels salespeople in one of the above enumerated divisions. Rather, the memorandum seems to "formalize" the procedure for paying commission on LMD "label sales" generally. Moreover, in addition to naming the heads of the divisions enumerated above, the memorandum is also addressed to "Label Salesforces." As Myers argues, possibly a factfinder would infer that this memorandum governs all sales made by LMD machinery salespeople in conjunction with any of Avery's "Label Salesforces," including the Security Printing Division's. Accordingly, we cannot say, as a matter of law, this memorandum does not encompass sales made by LMD machinery salespeople with label salesforces in the Security Printing Division.

Alternatively, Avery argues that even if this memorandum applies to label sales made in conjunction with Darwin, Myers is ineligible for the 1% commission because he failed to fill out and submit a "System Sales Qualification" form required under the May 17 memorandum. Although Myers admits that he did not submit this form, he asserts that this is not fatal to his claim and nothing in the record conclusively demonstrates that it is. The May 17 memorandum does not specify a time by which the form must be filed, or that failure to submit the form results in denial of a commission. Torres stated in deposition that occasionally salespersons had submitted these forms "after the fact," i.e., after the labels were sold and shipped, and they were nonetheless entitled to commission. Myers testified that label forms were often filed after the label sales were completed and that there was no firm deadline for filing. Thus, we cannot conclude, as a matter of law, that failure to submit this form deprives Myers of the claimed commissions.

Finally Avery argues that Myers was not "actively involved" in the "total sales" made during Darwin project as required pursuant to the May 17 memorandum, and thus, is not entitled to label compensation. Myers admits that he played a lesser role in the Darwin phase as compared to the T2 phase, but nonetheless asserts that he was sufficiently active in selling the "total system" to warrant a label commission. The record lends some support to this contention. After all, Myers' participation in the Duracell project (whether in the Darwin or T2 phase)

6

was "active" enough to receive commissions on the <u>machine sales</u>. Indeed, according to Hampton, Myers was "actively involved" in "working with . . . Duracell" during the T2 phase. Moreover, the record reflects that Myers' participation extended well into the Darwin phase. Bill Kennerly, an Avery executive instrumental to Darwin, testified in his deposition that the T2 team had not been "disbanded" but "expanded" to accommodate the additional personnel required to execute the Darwin project and that even during this expansion, Myers remained the only salesperson on the team, staying "in contact" with Duracell staff through the spring of 1994. Accordingly, a disputed issue of material fact exists as to whether Myers was "active" enough to warrant compensation under the memorandum, and so summary judgment in Avery's favor as to this claim cannot stand.

IV.

In sum, we affirm the district court's grant of summary judgment to Avery Dennison Corporation on the commission rate claim. As to the other two issues, we reverse and remand for further proceedings consistent with this opinion.

<u>AFFIRMED IN PART AND REVERSED
AND REMANDED IN PART</u>

BEEZER, Senior Circuit Judge, concurring in part and dissenting in part:

I concur in the opinion of the court, except for Part II. In Part II, the court adopts the reasoning of the district court and holds that Myers is bound by the written agreement for a reduced commission rate. I respectfully dissent.

To decide Avery's motion for summary judgment, the district court properly assumed that Myers' right to his standard 5.1% commission on machinery sales had already vested when Myers agreed to the 4-3-2% reduced commission structure. Avery could not have unilaterally reduced Myers' commission rate once Myers' right to his commission had vested. <u>See Progress Printing Co., Inc. v. Nichols</u>, 244 Va. 337, 340-41 (1992).

7

The district court determined, however, that the 4-3-2% commission agreement was a superseding contract based on an offer, acceptance and valid consideration. The district court concluded that "consideration for the agreement is clearly exhibited in the commission payments" Myers ultimately received. That conclusion is in error. "[A] new promise, without other consideration than the performance of an existing contract in accordance with its terms, is a naked promise without legal consideration therefor[e] and unenforceable." Seward v. New York Life Ins. Co., 154 Va. 154, 168 (1930). As consideration for the 4-3-2% commission agreement, Avery promised only to pay a portion of the commission already owed to Myers under the standard 5.1% commission agreement. Because the 4-3-2% agreement was not supported by valid consideration, it was not a superseding contract, and Myers is entitled to enforce the standard commission agreement.

I would reverse the decision of the district court on this issue and remand for the trier of fact to determine whether Myers' right to the 5.1% commission had actually vested at the time the 4-3-2% agreement was reached.

8